UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| George Moore, *on behalf of himself and others similarly situated.* | |
| *Plaintiff,* | No. 21 CV 2403 |
| v. | Judge Lindsay C. Jenkins |
| Torchlight Technology Group, LLC, Call Centrix, LLC, and Carol Stitz | |
| *Defendants.* | |
| Torchlight Technology Group, LLC | |
| *Cross-Claim Plaintiff,* | |
| v. | |
| Call Centrix, LLC, | |
| *Cross-Claim Defendant.* | |

**MEMORANDUM OPINION AND ORDER**

In his amended complaint, Plaintiff George Moore ("Moore") alleges violations of the Telephone Consumer Protection Act ("TCPA") against Defendants Torchlight Technology Group LLC ("Torchlight"), Call Centrix LLC ("Call Centrix"), and Carol Stitz (collectively, "Defendants"). [Dkt. No. 32.] In turn, Torchlight filed six cross-claims against Call Centrix. [Dkt. No. 63.] Before the Court is Torchlight's partial summary judgment motion as to Cross-Claims One and Three. [Dkt. No. 79.] For the reasons stated below, the motion is granted. [*Id.*]

1

I.    **Background**[1]

A.    **Factual Background**

Torchlight "is a provider of marketing services to companies in the insurance and specialty finance industries." [Reply Statement of Facts ("RSoF")[2] Dkt. No. 85-1 at ¶ 1.] Call Centrix provides "'compliant lead generation' call center services." [*Id.* at ¶ 2.] More simply, Call Centrix provides telemarketing services to companies selling and advertising products and services and helps connect them with potentially interested consumers. [Response Statement to Additional Facts ("RSoAF") at ¶ 1.] Carol Stitz is the owner, Chief Executive Officer, and operator of Call Centrix. [RSoF at ¶ 2.]

Torchlight hired Call Centrix to transfer telephone calls, or "consumer leads," from consumers who had provided valid written consent to receive telemarketing calls about insurance and specialty financial products. [Dkt. No. 80 at 1; RSoF at ¶¶ 1, 14.] Call Centrix thereafter outsourced its telemarketing services to vendors who provided telemarketing agents to perform "prequalification," or verification that callers had consented to receive telemarketing phone calls. [RSoF at ¶¶ 29–30; RSoAF at ¶ 1.] Call Centrix hired two vendors—Wolf BPO, a company located in

---

[1]    The following facts are undisputed, unless otherwise noted. The Court views the facts in the light most favorable to the non-moving party—Call Centrix. *See Blow v. Bijora*, 855 F.3d 792, 797–98 (7th Cir. 2017).

[2]    While the Court would ordinarily refer to facts contained in Rule 56.1 Statement of Facts, responses, and replies by their corresponding docket numbers, the parties have helpfully compiled Torchlight's Rule 56.1 Statement of Facts, its responses, and replies and Call Centrix's Rule 56.1 Statement of Additional Facts and response into one document. *See generally* [Dkt. No. 85-1.] As such, when citing to facts within Torchlight's Rule 56.1 Statement of Facts, its responses, and replies, the Court will refer to the document as "Reply Statement of Facts" or "RSoF." When citing to facts within Call Centrix's Rule 56.1 Statement of Additional Facts and response in one document, the Court will refer to the document as "Response Statement to Additional Facts" or "RSoAF."

Pakistan, and Call Centrix, Inc., an entity located in the Philippines. [RSoF at ¶¶ 19, 30.]

To memorialize the terms of their agreement to work together, Torchlight and Call Centrix signed an Insertion Order with accompanying Terms and Conditions (collectively, "the Agreement"). [*Id.* at ¶ 3.] The Agreement is explicitly governed by Pennsylvania state law. [*Id.*] Torchlight agreed to pay Call Centrix approximately nine hundred thousand dollars in exchange for Call Centrix's telemarketing services. [*Id.* at ¶ 45.] In the Agreement, Call Centrix made certain representations and warranties, four of which are pertinent to this matter. [*Id.* at ¶ 11.]

First, Call Centrix represented that all the consumers whose calls it transferred to Torchlight gave express written consent to receive telemarketing calls about insurance as required by the TCPA and Do Not Call List requirements.[3] [*Id.* at ¶¶ 14–15.] Call Centrix warranted that consumers' prior consent would be validated by third-party software. [*Id.* at ¶ 16.] Call Centrix additionally agreed to preserve records of all calls made for five years and provide those records within five business days on request. [*Id.* at ¶¶ 14, 24.] Call Centrix concedes that it understood that it was required to comply with the TCPA and its regulations in these warranties and that it understood that Torchlight relied on its assurances to that effect. [*Id.* at ¶¶ 12–13.] Second, Call Centrix warranted that it would monitor and control its vendors, who were similarly required to comply with the Agreement. [*Id.* at ¶¶ 28, 30, 32, 36.]

---

[3]     The parties defined a lead as "[v]alid" if it "is not fraudulent or generated by an automated program, incentivized by compensation or other incentives" and "is not generated in violation of any representation, warranty or obligation of [Call Centrix] under this Agreement." [Dkt. No. 85 at ¶ 14.]

Call Centrix agreed that if it used vendors, it would "be liable for any breach by such [vendor]." [*Id.* at ¶ 28.] Third, Call Centrix agreed to obtain comprehensive insurance coverage for its actions under the Agreement and name Torchlight as an additional insured. [*Id.* at ¶¶ 42–44.]

Finally, Call Centrix "agreed to indemnify, defend, and hold Torchlight harmless from any and all claims arising from any actual or alleged breach of the express representations or warranties Call Centrix made under the Agreement." [*Id.* at ¶ 48; Dkt. No. 81-2 at 11.] Call Centrix concedes that if it failed to promptly assume the defense of such a claim, then Torchlight was contractually allowed to participate in the defense against such a claim with its own counsel at Call Centrix's expense. [RSoF at ¶ 49.]

The parties agreed that some of these terms would survive termination of the contract. [*Id.* at ¶ 46.] This included Call Centrix's obligation to maintain and produce evidence of consent, duty to obtain insurance coverage, duty of indemnification, and "the payment, audit, or any other provisions that by their own nature should survive termination." [*Id.*]

From November 11, 2020 to November 11, 2021, Call Centrix transferred consumer calls to Torchlight, per the parties' Agreement. [*Id.* at ¶ 5; Dkt. No. 81-2 at 2.] As relevant to this case, on March 22, 2021, Call Centrix, through Wolf BPO, placed a call to Plaintiff George Moore, and thereafter transferred that call to Torchlight. [RSoF at ¶ 6.] Sometime thereafter, Torchlight discovered that Call Centrix had materially breached the express representations and warranties

4

promised in the Agreement, including its promises to receive express written consent from consumers, monitor and control telemarketing vendors, and obtain insurance coverage. [*Id.* at ¶ 46.] Call Centrix concedes that these breaches were material. [*Id.*] As a result, Torchlight terminated the Agreement and withheld its final payment to Call Centrix. [*Id.*]

### B. Procedural Background

On December 2, 2021, Moore filed a First Amended Complaint ("FAC")—the operative complaint in this matter—against Torchlight, Call Centrix, and Stitz. [Dkt. No. 32.] In the FAC, Moore alleges that he received the March 22, 2021 call from Torchlight in violation of the TCPA, 47 U.S.C. § 227, *et seq.* and its appended regulations. [Dkt. No. 32 at ¶¶ 31–35; RSoF at ¶¶ 7–8.] Torchlight and Call Centrix thereafter filed answers. [Dkt. No. 39–40.]

On March 23, 2022, Torchlight sent a demand letter to Call Centrix, requesting that, per the Agreement, Call Centrix indemnify Torchlight against Moore's claim. [Dkt. No. 81-7 at 1–3.] Specifically, Torchlight sought to "remind [Call Centrix] of [its] obligations," specifically "to comply with the indemnification rules set forth in subsection 11.2 of the Agreement by making a demand for indemnification." [*Id.* at 2; RSoAF at ¶ 4; Dkt. No. 81-7 at 2.]

At the outset, Call Centrix refused to indemnify Torchlight for its losses, costs, and damages incurred by Torchlight in connection with the present case. [RSoF at ¶ 56.] Call Centrix explained that it did not need to indemnify Torchlight because there was "only one call to Mr. Moore under the Agreement and because Call Centrix's

5

vendor Wolf BPO is the one to blame." [*Id.* at ¶ 57.] As a result, Torchlight continued to litigate this case with separate legal counsel. [Dkt. No. 81-2 at 11.] Torchlight thereafter amended its answer to Moore's complaint to include six cross-claims against Call Centrix for contractual indemnity (Cross-Claim One), indemnity by operation of law (Cross-Claim Two), breach of contract (Cross-Claim Three), breach of covenant of good faith and fair dealing (Cross-Claim Four), fraudulent inducement (Cross-Claim Five), and fraud (Cross-Claim Six). [Dkt. No. 63 at ¶¶ 46–119.]

During discovery regarding Moore's underlying claims and Torchlight's cross-claims, the parties discovered undisputed evidence that Call Centrix failed to uphold many of its Agreement obligations. Call Centrix concedes these failures constitute breaches of the Agreement. [RSoF at ¶ 55.]

As to Call Centrix's obligation to maintain and produce evidence of consumer consent, Call Centrix concedes that Moore did not consent to receive telemarketing calls. [*Id.* at ¶¶ 17–23.] Initially, Call Centrix provided what purported to be Moore's consent to receive telemarketing calls generated from "FindQualityInsurance.com," based on a document that Wolf BPO provided to Call Centrix. [*Id.* at ¶ 19.] In truth, this document was "fabricated." [*Id.* at ¶¶ 22.] Moore denied having visited this website and the website itself confirmed that it had no record of Moore's consent. [*Id.* at ¶¶ 20–21.] As such, Call Centrix concedes that it does not have any evidence of valid written express consent to initiate telemarketing calls to Moore and thus, Moore

did not consent to receive such calls.[4] [*Id.* at ¶¶ 17–18, 23, 41.] Call Centrix further conceded that it otherwise did not have a written recordkeeping policy during the relevant period or otherwise ensure that its vendors had one. [*Id.* at ¶¶ 25–26.] Indeed, Call Centrix produced no call records from Wolf BPO during discovery. [*Id.* at ¶ 27.]

As to Call Centrix's obligation to ensure vendor compliance, Call Centrix concedes that it had no written policies relevant to the selection and monitoring of its vendors. [*Id.* at ¶ 31.] While Call Centrix initially represented that all of its consumer "leads" came with independently verified consumer consent through the use of certain third-party programs like TrustedForm or Jornaya, Call Centrix produced no documents establishing that it had instructed its vendors to call only consumers who gave verified consent. [*Id.* at ¶ 33.] As it turns out, Call Centrix had no written contracts with its vendors, produced no information about vendors' compliance procedures, and never completed an audit or review of Wolf BPO or any other vendor to ensure that vendors were receiving the requisite consumer consent to initiate telemarketing calls. [*Id.* at ¶¶ 33–35, 37, 39–40.]

As to its obligation to obtain insurance coverage, Call Centrix conceded that it did not obtain insurance coverage for the services it provided Torchlight, nor did it name Torchlight as an additional insured, as required. [*Id.* at ¶¶ 43–44.]

---

[4] Call Centrix also concedes that it has no evidence of valid written express consent for any of the putative class members named in Moore's FAC. [RSoF at ¶ 18.]

After this discovery concluded, the parties agreed that the Court should resolve the issue of whether Call Centrix must indemnify Torchlight. [Dkt. No. 74.] Torchlight's motion for partial summary judgment followed, and the parties also requested and received a discovery stay pending resolution of that motion. [Dkt. Nos. 77 and 79.]

## II. Legal Standard

The Court should grant summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Skiba*, 884 F.3d at 717 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Id.* (quoting *Feliberty v. Kemper Corp.*, 98 F.3d 274, 276–77 (7th Cir. 1996)). In doing so, the Court may not weigh conflicting evidence or make credibility determinations. *See Johnson v. Advoc. Health & Hosp. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). Further, the Court must give the nonmovant "the benefit of reasonable inferences from the evidence, but not speculative inferences in [her] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citation omitted). "The controlling question is whether a reasonable trier

of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## III.   Analysis

### A.   Choice of Law

The Court's first task is to independently determine what substantive law applies based on governing choice-of-law rules. A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which the court sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *see also NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 300 (7th Cir. 2018). This Court, sitting in Illinois, looks to Illinois choice-of-law rules, and notes that Illinois courts generally enforce contractual choice-of-law provisions. *See NewSpin*, 910 F.3d at 300; *see also Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 194 (Ill. 2002) ("Generally, choice of law provisions will be honored.").

Here, the Agreement states that Pennsylvania state law should govern any potential disputes [Dkt. No. 81-2 at 12]. No party contests the Agreement's validity on this score, [Dkt. No. 80, 84], so the Court applies Pennsylvania law to Torchlight's breach of contract and indemnification claims.

### B.   Cross-Claim One: Contractual Indemnification

Torchlight first moves for summary judgment on its cross-claim for contractual indemnity. [Dkt. No. 79 at 1–2; Dkt. No. 80 at 7–10.] Call Centrix concedes that (a) Torchlight received a third-party claim based on contract breaches by Wolf BPO; (b) it agreed to be liable for those breaches, and thereafter, (c) Torchlight called for Call

Centrix to indemnify it per the Agreement. [RSoF at ¶¶ 28, 32, 49, 52–54.] In essence, Call Centrix agrees that based on the Agreement's requirements, Torchlight should be indemnified.

Call Centrix raises two arguments in opposition to a summary judgment finding on contractual indemnity. First, it argues that the claim is not ripe for adjudication and second, it argues that Torchlight's March 23, 2022 written demand letter that called upon Call Centrix to indemnify Torchlight did not request that Call Centrix assume defense of the case on Torchlight's behalf. [Dkt. No. 84 at 4–8.] The Court addresses each argument in turn.

### 1. Ripeness

Call Centrix first argues that Torchlight's indemnification claim is not ripe for adjudication [Dkt. No. 84 at 6–8]. While "[i]n the insurance context," the Seventh Circuit advises courts to postpone "decisions about indemnity . . . until the underlying liability has been established," the court has cautioned that "the rule is not absolute." *T.H.E. Ins. Comp. v. Olson*, 51 F.4th 264, 270 (7th Cir. 2022) (citing *Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003)); *see also Bankers Tr. Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 680 (7th Cir. 1992) (noting that the understanding that indemnity decisions should be postponed until the underlying suit is resolved is a "general rule rather than an absolute one"). Although postponement of indemnity decisions "reflects [the Seventh Circuit's] concerns about wading into an abstract dispute," it has "gone the other way where indemnification issues did not hinge on remote contingencies and facts." *Olson*, 51 F.4th at 270. In

this context, an issue is more likely to be ripe for adjudication "if it is purely legal rather than factual." *Id.*; *Amling v. Harrow Indus. LLC*, 943 F.3d 373, 378–79 (7th Cir. 2019) (concluding that "[t]here is nothing remote about a plaintiff's asking which of two defendants she is currently suing is the right one to sue" under the terms of an executed asset-purchase agreement).

The indemnity issue here is neither abstract nor remote. As a matter of law, Call Centrix concedes that Torchlight meets the requirements to be indemnified under the Agreement and Pennsylvania law. *See Jacobs Constructors, Inc. v. NPS Energy Servs., Inc.*, 264 F.3d 365, 371 (3d Cir. 2001) (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986)) (observing that contractual indemnity is a "question of law" for the Court to resolve). Call Centrix admits that Moore alleges he received telemarketing calls in violation of the TCPA and that Torchlight is accused of being liable for these violations. [RSoF at ¶¶ 52–53.] Call Centrix admits that it "agreed to indemnify, defend, and hold Torchlight harmless from any and all claims arising from any actual or alleged breach of the express representations or warranties Call Centrix made under the Agreement." [*Id.* at ¶ 48.] It further admits that Moore's claims stem from Call Centrix's admitted breaches of the express representations or warranties Call Centrix made under the Agreement. [*Id.* at ¶¶ 53–55.] And finally Call Centrix admits that Torchlight made a proper indemnification demand by way of the March 22, 2023 demand letter. [*Id.* at ¶¶ 52–55.] The "underlying dispute"— here Moore's TCPA claim—would necessarily require consideration of whether Call Centrix must indemnify Torchlight, which, as noted above, is a settled question.

11

Neither party points to any "evolving or unknown facts" that would change this decision. *See Olson*, 51 F.4th at 270. In short, unlike *Lear*, the Court would not be needlessly wading into an abstract dispute by reaching the indemnification question, and thus concludes that it is ripe for adjudication.

### 2.      Torchlight's March 23, 2022 Demand Letter

The Court next turns to Call Centrix's second argument: that Torchlight failed to request that Call Centrix assume defense of the case as required by the indemnification provision of the Agreement. [Dkt. No. 84 at 4.]

Under Pennsylvania law, "[t]he fundamental rule in contract interpretation is to ascertain the intent of the contracting parties." *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006) (citations omitted); *see also Doe v. Univ. of Scis.*, 961 F.3d 203, 212 (3d Cir. 2020) ("When interpreting a contract, the court's paramount goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement."). If a contract is "clear and unambiguous," the Court determines the parties' intent by looking at the "express language of the agreement." *Ins. Adjustment Bureau*, 905 A.2d at 468; *see also Doe*, 961 F.3d at 212. However, if a contract is ambiguous or otherwise unclear, parol evidence can be used to explain or clarify the ambiguity. *See Ins. Adjustment Bureau*, 905 A.2d at 468.

"A contract contains an ambiguity if it is reasonably susceptible of different construction and capable of being understood in more than one sense." *Ins. Adjustment Bureau*, 905 A.2d at 468–69; *see also Pac. Emps. Ins. Co. v. Glob.*

12

*Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012). The fact that parties disagree on the proper construction of a contract does not render the contract ambiguous. *See Pac. Emps. Ins. Co.*, 693 F.3d at 426. Because "the law does not assume that the language of the contract was chosen carelessly," that language is of "paramount importance*." Id.* (quoting *Meeting House Lane, Ltd. v. Melso*, 628 A.2d 854, 857 (Pa. Super. Ct. 1993)). "The parties have a right to make their own contract, and it is not the function of the court to rewrite it or give it a construction in conflict with the accepted and plain meaning of the language used." *Id.* (quoting *Bombar v. W. Am. Ins. Co.*, 932 A.2d 78, 99 (Pa. Super. Ct. 2007)). When analyzing an indemnity contract or clause specifically, the Court must decide its construction as "a question of law" relying on much the same rules as elucidated above. *Jacobs*, 264 F.3d at 371 (quoting *Hutchison*, 519 A.2d at 390). The Court strictly construes the scope of an indemnity clause against the party seeking indemnification. *Id.*

The indemnification provision in the Agreement states as follows:

**11.1   Indemnification**. Each Party (as "Indemnifying Party") agrees to defend, indemnify and hold harmless the other Party (the "Indemnified Party") and its affiliates, and its and their respective, members, managers, partners, officers, employees, contractors and agents (collectively, the "Indemnified Persons"), from and against any and all claims, costs, losses, damages, judgments and expenses (including reasonable attorneys' fees) (collectively, "Losses") suffered, sustained or incurred by the Indemnified Party and the Indemnified Persons in connection with any third-party claim or demand that arises out of or relates to (a) any actual or alleged breach of the Indemnifying Party's express representations or warranties in this Agreement; or (b) a violation of applicable Laws by the Indemnifying Party or its personnel.

**11.2   Indemnification Rules**. Upon receipt of a third party claim or demand for which a Party or one of its Indemnified Persons is entitled

to indemnification, or in any other event where a Party believes one of its Indemnified Persons is entitled to indemnification, the "Indemnified Party" shall (i) promptly notify the Indemnifying Party in writing of the nature of the claim and the names and addresses of the persons involved in or having an interest in such claim; provided, that neither the failure to provide such notice nor any delay in providing such notice shall release the Indemnifying Party from any of its obligations under this Section 7, except to the extent the Indemnifying Party is materially prejudiced by such failure or delay; (ii) permit the Indemnifying Party to assume defense of such claim or demand; and (iii) reasonably cooperate with the Indemnifying Party in the defense of such claim or demand. The Indemnified Party and any Indemnified Persons may participate in such defense through counsel of their choosing at their own expense, except that the expense shall be borne by the Indemnifying Party if it does not promptly assume defense of such claim. The Indemnifying Party shall be entitled to exercise control of the settlement of any claim or demand giving rise to the claim to indemnification, provided, that before entering into any settlement of the claim or demand, the Indemnifying Party shall be required to obtain the prior written approval of the Indemnified Party, which shall be not unreasonably withheld or delayed, if pursuant to or as a result of such settlement, injunctive or other equitable relief or any other non-monetary obligation would be imposed against the Indemnified Party or its assets or business.

[Dkt. No. 81-2 at 11.]

Pursuant to these terms, Torchlight, as the Indemnified Party, was required to do three things under the "Indemnification Rules:" First, it was required to promptly notify Call Centrix about "the nature of the claim and the names and addresses of the persons involved in or having an interest in such claim." [*Id.*] Failure to do so promptly might release Call Centrix from "any of its obligations . . . except to the extent the Indemnifying Party is materially prejudiced by such failure or delay." [*Id.*] Second, Torchlight was required to permit Call Centrix to "assume defense of such claim or demand." [*Id.*] And third, Torchlight was required to "reasonably cooperate" with Call Centrix in the defense of the claim or demand. [*Id.*] In this

14

regard, Call Centrix's failure to promptly assume the defense of a third-party claim meant that Torchlight could participate in the defense with its own counsel, but at Call Centrix's expense. [*Id.*; RSoF at ¶ 49.]

Call Centrix concedes that it has a duty to indemnify Torchlight under the requirements of Subsection 11.2, and that those requirements were satisfied by the March 23, 2022 demand letter as it pertains to Torchlight's request to be indemnified. [Dkt. No. 84 at 6; Dkt. No. 81-7.] That letter, which identified Moore's lawsuit under the TCPA as a claim presented against Torchlight, called upon Call Centrix to "indemnify us for our claims arising from the Moore lawsuit." [Dkt. No. 81-7 at 2-3.] Indeed, Call Centrix's concessions in the RSoF leave no room for doubt that it has a duty to indemnify. [RSoF at ¶¶ 28, 48, 49, 32, 52-55.]

Nevertheless, Call Centrix argues that summary judgment is not warranted because Torchlight's March 23, 2022 letter failed to expressly demand "that Call Centrix *assume defense* of the case on behalf of Torchlight." [Dkt. No. 84 at 6 (emphasis added).] This argument is unpersuasive for several reasons. First, Subsection 11.2(i) simply required Torchlight, as the Indemnified Party, to "promptly notify [Call Centrix] in writing" of the nature of the claim and the identity of the persons involved. [Dkt. No. 81-2 at 11.] Torchlight did so. Nothing in this provision or any other part of the Agreement required it to send a separate letter, in addition to the one sent on March 23, demanding that Call Centrix assume defense of the case. Nor did the provision require Torchlight to use the word "defense" (or any other

language) in order to trigger Call Centrix's obligation to defend as Call Centrix urges. [Dkt. No. 81-2 at 11.]

Rather, the operative demand letter did what was necessary under the terms of the Agreement by expressly invoking the relevant subsection, that is, Subsection 11.2. After identifying the nature of Moore's claims, the letter said, "[w]e are sending you this notification to remind you of your obligations, to comply with the indemnification rules set forth in subsection 11.2 of the Agreement by making a demand for indemnification . . . ." [Dkt. No. 81-7 at 2-3.] It then stated, "[s]ubsection 11.1 of the Agreement provides that Call Centrix must indemnify Torchlight from any losses sustained by Torchlight in connection with any third-party claim or demand that arises out of or relates to any actual or alleged breach of Call Centrix's express representations or warranties in the Agreement." [*Id*.] The letter concluded with, "[a]t this time, Torchlight is demanding that you indemnify us for our claims arising from the Moore lawsuit." This satisfied the indemnification requirements of the Agreement.

Second, to the extent Call Centrix argues that Torchlight had the burden to say more to trigger its obligation to defend, it certainly does not point to any language in the Agreement in support of that position. This is unsurprising given that Section 11 places the onus on the Indemnifying Party, here Call Centrix, to promptly assume the defense. Subsection 11.2 provides, "[t]he Indemnified Party and any Indemnified Persons may participate in such defense through counsel of their choosing at their own expense, *except that the expense shall be borne by the Indemnifying Party if it*

*does not promptly assume defense of such claim.*" [Dkt. No. 81-2 at 11 (emphasis added)).] This language placed the onus on Call Centrix, once it received the requisite notice, to promptly assume defense of the claim or risk bearing the expense of not doing so. This burden shifting of expenses in the face of a failure to defend is inconsistent with Call Centrix's view that Torchlight was somehow required to use different language to trigger Call Centrix's obligation. By its plain terms, the Agreement called for Torchlight to "promptly notify" Call Centrix of the claim and to "reasonably cooperate," but nothing more.

Third, under Pennsylvania law, the duty to defend is "broader than the duty to indemnify since it applies not only to claims that 'are or reasonably appear to be within the scope of the indemnity obligation but also to claims that arguably are or might be found within that scope.'" *Bowman v. Am. Homecare Supply, LLC*, 2008 WL 4787558, at *6 (E.D. Pa. Oct. 30, 2008) (quoting *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 650 (3d Cir. 1990)). The duty to defend "is triggered if the underlying complaint avers facts that would support indemnification under the agreement." *Id.* (quoting *Mace v. Atl. Ref. Mktg. Corp.*, 785 A.2d 491, 500 (Pa. 2001)). Because Call Centrix concedes that Torchlight's demand letter triggered Call Centrix's duty to indemnify, this likewise triggered Call Centrix's duty to defend under applicable law.

The only remaining argument Call Centrix raises in its brief on this issue is that Torchlight has not identified with specificity what damages it is owed by virtue of its indemnity demand. [Dkt. No. 84 at 8.] This, of course, is no barrier to resolution

of the motion, as courts can render judgment on liability and leave the question of damages to the factfinder. *See, e.g., Wisc. Alumni Research Found. v. Xexon Pharm., Inc.*, 591 F.3d 876, 885 (7th Cir. 2010) (affirming summary judgment for a breach-of-contract claim on liability alone); *Pryer v. C.O. 2 Salvic*, 251 F.3d 448, 454–55 (3d Cir. 2001) (noting that district courts can permit trials on "all or part of the issues," including only damages). Torchlight's summary judgment motion as to Cross-Claim One for indemnification is granted.

### C. Cross-Claim Three: Breach of Contract

Torchlight also seeks summary judgment on its cross claim for breach of contract. [Dkt. No. 79 at 2; Dkt. No. 80 at 10–14.] Call Centrix argues that Torchlight has failed to establish damages and causation under Pennsylvania breach of contract law, and that Torchlight itself breached the contract. [Dkt. No. 84 at 8–9.]

To establish a claim for breach of contract under Pennsylvania law, Torchlight must show (1) the existence of a contract, including essential terms, (2) breach of a duty imposed by the contract, and (3) resulting damages. *See Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Call Centrix first argues that, as to damages, Torchlight "never specified an amount it contends to be owed by virtue of its breach of contract claim." [Dkt. No. 84 at 9.] But Pennsylvania law does not require the party claiming breach to identify a specific dollar amount to demonstrate damages. *See ATACS Corp. v. Trans World Comms., Inc.*, 155 F.3d 659, 669–70 (3d Cir. 1998) (noting that "mathematical certainty [in proving damages] is not typically required"

18

and "the general rule in Pennsylvania, as in most jurisdictions, is that if damages are difficult to establish, an injured party need only prove damages with reasonable certainty."); *Aiken Indus., Inc. v. Estate of Wilson*, 383 A.2d 808, 812 (Pa. 1978) ("Where substantial damage has been suffered, the impossibility of proving its precise limits is no reason for denying substantial damages altogether."). As such, the Court rejects Call Centrix's argument that Torchlight must offer a specific dollar amount to meet its damages burden.

This conclusion, of course, does not release Torchlight from its burden to prove its contract damages with reasonable certainty. *See Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Fam. Mkt., Inc.*, 98 A.3d 645, 661 (Pa. Super. Ct. 2014) ("The burden is on the breaching party to show that further loss could have been avoided by reasonable efforts of the injured party."). "The question of whether damages are speculative 'has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages.'" *Id.* (quoting *Wachovia Bank, N.A. v. Ferretti*, 935 A.2d 565, 572 (Pa. Super. Ct. 2007)); *see also ATACS Corp.*, 155 F.3d at 669 (defining "reasonable certainty" as requiring a "rough calculation that is not too speculative, vague or contingent upon some unknown factor" (internal quotation marks omitted)). Although the Court may not be able to presently calculate the total damages that Torchlight might expect to incur as a result of the underlying TCPA litigation, these damages are readily identifiable. *Id.*

Next, Call Centrix contends that Torchlight fails to "offer[] evidence of causation connecting any breach to any specified amount of damages." [Dkt. No. 84

at 9.] As an example, Call Centrix points to Torchlight's apparent failure to present evidence suggesting that Call Centrix's "lack of insurance caused any specific loss to Torchlight," and that there is, at best, an "assumption that the existence of insurance would have altered the course of this lawsuit." [*Id.*] This argument fails.

To recover damages for a contract breach, Torchlight must establish a "causal relationship between the breach and the loss." *Brader v. Allegheny General Hosp.*, 64 F.3d 869, 878 (3d Cir. 1995) (citing *Robinson Protective Alarm Co. v. Bolger & Picker*, 516 A.2d 299, 303 n.9 (Pa. 1986)). Whether causation has been established in a breach of contract action at the summary judgment stage is "normally a question of fact for the jury; the question is to be removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue." *First Sealord Sur. v. Durkin & Devries Ins. Agency*, 918 F. Supp. 2d 362, 388 (E.D. Pa. 2013) (quoting *Summers v. Certainteed Corp.*, 997 A.2d 1152, 1163–64 (Pa. 2010)). To show causation, Torchlight "need not exclude every possible explanation"; rather, "it is enough that reasonable minds are able to conclude that the preponderance of the evidence shows [Call Centrix's] conduct to have been a substantial cause of the harm to plaintiff." *Id.* at 388–89 (quoting *Summers*, 997 A.2d at 1163–64).

The record here contains countless concessions by Call Centrix such that reasonable minds could not disagree: there is no genuine issue of material fact that Torchlight was injured as a proximate cause of Call Centrix's breach. Call Centrix concedes that it materially breached the Agreement by, among other things: failing to obtain liability insurance; failing to ensure vendor compliance; failing to maintain

20

and produce records regarding consumer consent to receive telemarketing calls; and failing to indemnify Torchlight against Moore's claims. [Dkt. No. 85 at ¶¶ 14, 17, 23–41, 43–44.] It is difficult to imagine how these breaches could not have caused Torchlight's harm. Indeed, Call Centrix's failure to ensure vendor compliance with the TCPA resulted in this very lawsuit by Moore. [Dkt. No. 32.] Call Centrix's feeble attempts to create doubt as to causation are "metaphysical doubt as to material facts," at best. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citation omitted) (on summary judgment, a district court must give "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor"). The Court rejects this causation argument.

Finally, Call Centrix meagerly argues that Torchlight's failure to remit its final payment owed under the Agreement "raises an issue of fact as to whether Torchlight performed its obligations under the Agreement." [Dkt. No. 84 at 9.] Curiously, Call Centrix raises this argument without having brought a claim of its own for breach of contract or otherwise asserting that Torchlight was not justified in its breach. [Dkt. No. 85 at 10.]

Nonetheless, Call Centrix admits that "Torchlight paid Call Centrix pursuant to the Agreement *up until Torchlight determined that Call Centrix materially breached the Agreement*," at which point, Torchlight terminated the Agreement and stopped payment. [Dkt. No. 85 at ¶ 46 (responding as "Admitted" (emphasis added)).] Pennsylvania law has long recognized that "a material breach of a contract relieves

the non-breaching party from any continuing duty of performance thereunder." *LJL Transport. Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 648 (Pa. 2009); *see also Ott v. Buehler Lumber*, 541 A.2d 1143, 1145 (Pa. Super. Ct. 1988) (observing that "[a] party also may not insist upon performance of the contract when [it itself] is guilty of a material breach of the contract"). Because Call Centrix materially breached the Agreement first, Torchlight was released from performance of its payment obligation. [*Id.*] As such, the Court rejects the argument that Torchlight's failure to remit final payment renders summary judgment improper. Torchlight's summary judgment motion as to Cross-Claim Three for breach of contract is granted.

## IV. Conclusion

For these reasons, Torchlight's motion for partial summary judgment is granted. [Dkt. No. 79.] The Court lifts the previously imposed discovery stay [Dkt. No. 77.] By June 15, 2023, the parties are to submit a proposed written discovery schedule to Judge Valdez, who will continue to supervise discovery, addressing what fact discovery that remains outstanding and the time required to complete it.

Enter: 21-cv-2403
Date: June 7, 2023

_____
Lindsay C. Jenkins
United States District Judge